**JOHN L. BURRIS, Esq./ State Bar #69888**
**BENJAMIN NISENBAUM, Esq./State Bar #222173**
**JAMES COOK, ESQ., SBN 300212**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

**JAMES B. CHANIN, Esq./ State Bar #76043**
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752
Facsimile: (510) 848-5819

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.S., individually and as successor-in-interest to Decedent ERIK SALGADO by and through her guardian ad litem Michael Colombo; BRIANNA COLOMBO and FELINA RAMIREZ Parent of decedent, <br><br> Plaintiffs, <br> vs. <br><br> RICHARD HENDERSON, individually; ERIC HULBERT, individually; DONALD SAPUTA, individually, DOES 4-25, inclusive, <br><br> Defendants. | Case No. 3:20-cv-04637-VC <br><br> **PLAINTIFFS' EXHIBITS B THROUGH K IN OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF** <br><br> **UNREDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED** <br><br> DATE: October 7, 2021 <br> TIME: 2:00 p.m. <br> DEPT: Via Zoom <br> JUDGE: Hon. Vince Chhabria <br><br> Trial Date: March 28, 2022 <br> FAC Filed: September 3, 2020 |

Plaintiffs respectfully submit the below Exhibits B through K in opposition to Defendants

Motion for Relief.

1

2    Dated: September 27, 2021                    **The Law Offices of John L. Burris**

3

4                                                 /s/*Benjamin Nisenbaum*

5                                                 Ben Nisenbaum
                                                  Attorney for Plaintiffs
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit B

SALGADO HENDERSON OIS INTERVIEW TRANSCRIPT SEGMENTS

Time segment 1:20:06-1:21:40

Q: *Okay, which way was the silver Ram facing?*

A:  Facing that direction.

*Q: Okay.*

Q:  *And then we're so—the silver Ram's over here, the canine. Did you remain in the street or did you go to the sidewalk?*

A:  I stayed in the street.

*Q:  Ok*

A:  And I know Sapuda booked it for the sidewalk.

*Q:  Ok*

A:  And this is the moment where you saw the canine door open?

*Q:  Yes.*

Q: *Okay. Did you see Kirby exit the vehicle?*

A:  I did not see Kirby.

*Q:  Okay. Um of officers that was there, or depicted on the – that was on scene.  Are you aware of any of their positioning?*

A:  So, at this point at this I know Taylor Case is here.

*Q:  Can you put a C for Taylor case? Okay. And then who else do you know?*

A:  I know Sapuda was running this was.

*Q:  Okay: "S". Sapuda was running this way?*

A:  I was running this way here. And then who I thought was Hulbert, who was actually Diehl, was standing right—can I just draw right there?

*Q:  Yeah, let's use a triangle for who you thought was Hulbert but turned out to be Diehl.*

A:  Right there.

*Q:  And roughly where was the suspect vehicle?*

A:  Suspect vehicle was…here.


Time segment 1:22:45-1:25:50

*Q:  Mark this number two, and this is the positioning, This is the position of the vehicles when you got out of your vehicle.  To the best of your recollection, can you remember where everybody was at that-- Are there any other officers that you saw standing outside, or even inside their vehicles, at this point?*

A:  No.

*Q: And the "C" is for Case right?  Officer Case.*

Attorney: And a triangle is for the individual that he believed to be Hulbert, but later on realized was Diehl

Q:  *Okay, sir, I'm gonna ask you, we're gonna ask you one more. And this time what we're trying to figure out – and like I said, it's best of your recollection -- is the positioning of your officers and the suspect vehicle… the moment before you start firing your weapon.*

A: What I--  what I saw before what I thought before I started firing?

*Q:  Yessir.  And then again, I understand that some of the positionings is incorrect. And you know, let me know what what-- what vehicle is actually where.*

*The moment—the second right before you started firing, where were you standing? Because we're not going to show you another map, this is the third map showing you firing.*

A:  So this is the place moving my selector level to fire?

*Q:  Yes*

A:  So I'm going to put a question mark here because I honestly don't know.

*Q:  Absolutely.*

1:24:48
A:  I'm going to put this truck…. [extended silence while drawing] that's the suspect vehicle… This s blue triangle underneath the suspect vehicle is where I believe the officer that I saw standing here was

2

*Q: mm-hmm.  You refer to the second map as a triangle, that was the officer who you're now referring to on the third map, you believe was underneath? Or somewhere underneath this other vehicle?*

A: Yes.

*Q:  That's correct?*

A:  That's correct.


Time segment 1:28:56-1:29:55

*Q:  And, um, I'm-- why did you fire your weapon?*

A:  Because I believed my officer was being murdered by the driver of that car. And then he was under there getting burned and crushed, because someone didn't want to go to jail. And I was just trying to stop him from hurting him further. And, that's why I did that.

*Q:  And, um, what--*

A:  I gotta clarify. I don't know if he just didn't want to go to jail or if he wanted to murder someone just because they were policemen. So, I don't know what his motivation was, but I knew my guy was getting hurt.


Time segment 1:29:56-1:32:15

*Q:  Okay, so um, what-- What led you to believe that -- and we understand that you believe was officer Hulbert, which actually end up being later on being Officer Diehl – correct –*

A.  Right.

*Q:  But I'd like you to kind of break it down to me and explain me what led you to believe that Officer Hulbert was underneath that vehicle? And, was somebody telling you that, did somebody yell at you that, did you see Officer Hulbert under the vehicle I'm just trying to wrap my head around this. What was it that led you to believe that Officer Hulbert was underneath that vehicle.*

A:  So, the quick answer is when the vehi—

*Q:  No, I don't want the quick answer.*

A:  Okay.

*Q:  You can take all the time you want obviously.*

A:  Diehl and Hulbert are similar in stature and size. They're both wearing the same type of vest, and Diehl was standing next to Hulbert's open door. I know. So, in my mind, I believe it was Hulbert, right? It wouldn't have made a difference if it was Diehl or Hulbert. I love them both the same. I supervise both of them that night. He was standing there when the vehicle went airborne after instruct the front of the vehicle and the parked car. When the vehicle came back down, he was gone.

I couldn't see him anymore. He was-- I could see the front of the car. And he wasn't in front of it. I don't know where-- else he could have been other than under the car. Because right where he had been standing previously, the front of the car was…. and I yeah, does that answer your question, sir?

*Q:  Um, yeah, I'm gonna have a couple more questions. So, right when-- the last time you saw Officer Hulbert was where? Somewhere on each one of you one of these [apparently pointing to maps]*

A: Right behind the door. Right here.

*Q:  Is that is that the triangle?*

A:  Yes, sir.

Q: *And, just for the record, for the individuals in the room listening, this triangle is just south of the silver Ram. And is just east of the suspect vehicle, which would put it right in front of the suspect vehicle.*

*That's the last-- last time you can do you can constantly saw officer Hulbert, that you believe the officer Hulbert?*

A:  Yes.


Time segment 1:52:48-1:55:04

*Q:  And where were you taken after the incident?*

A:  A gas station, I think off of 98th and 580. And then, from there back to here. And then from here back to the scene for the walkthrough. From there back to here. And then after that I went home.

*Q:  I don't, I don't want to change the facts, or anything about this, what you're telling us about the situation, but there's one thing I want to remove and I just want you tell me. No one knows this happens. But tell me, what in your mind would have happened if one thing was removed. If you didn't see Officer, if you didn't believe Officer Hulbert was under that vehicle, and you saw him right next to you, but everything else was occurring as so, what in your training, and your experience-- What was the next steps that would have happened?*

The next as if there was no officer in front of or under the vehicle?

*Q:  Correct.*

A:  I would have broadcast it, put it out to our other units. Told the other units to go, told my marked vehicle go in pursuit of it if his vehicle was still able. If that vehicle became disabled or lodged there, I would have broke out the window and drug [sic] the driver out and taken him into custody. If it was able to flee I would've let flee and put it out to air and, and when we had the plate, although it was a stolen plate, we would have found the vehicle again. You know what I mean? And we could have either pursued it, waiting for it to crash.

*Q:  What would've happened if it just stayed there redlining, redlining redlining but Officer Hulbert, later Officer Diehl, was right next to you and just continues redlining.*

A:  I would have told Sapuda to take his window punch, punch the window out and, we would have taken the driver out. We woulda issued him commands, [if] he didn't comply with those commands, I would have taken him out of the front seat and taken him into custody.

Exhibit C







Exhibit D

XAVIER BECERRA
Attorney General of California
JOEL A. DAVIS
Supervising Deputy Attorney General
DONNA M. DEAN
Deputy Attorney General
State Bar No. 187104
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone:  (213) 269-6509
  Fax:  (213) 897-2810
  E-mail:  Donna.Dean@doj.ca.gov
*Attorneys for Defendants*
*State of California, Jon Cleveland*
*and Richard Henderson*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ARMANDO VILLANUEVA AND HORTENCIA SAINZ, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO PEDRO VILLANUEVA, DECEASED, AND FRANCISCO OROZCO, INDIVIDUALLY,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**STATE OF CALIFORNIA; JOHN CLEVELAND; RICH HENDERSON; AND DOES 1-10, INCLUSIVE,**<br><br>Defendants. | Case No. 8:17-cv-01302 JLS (KESx)<br><br>**DECLARATION OF RICHARD HENDERSON IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:          August 10, 2018<br>Time:          2:30 p.m.<br>Courtroom:  10-A<br><br>Judge:          Hon. Josephine L. Staton<br><br>Trial Date:    Not set<br>Action Filed: June 26, 2017 |

1

## DECLARATION OF RICHARD HENDERSON

I, Richard Henderson, declare as follows:

1.    I am employed by the California Highway Patrol (CHP) as a sergeant and am a peace officer under state law. In July 2016, I was an investigator in the Vehicle Theft Unit of the Southern Division Investigative Service Unit (ISU).

2.    The matters set forth herein are within my personal knowledge, and, if called to, I could and would testify competently regarding the matters.

3.    On July 3, 2016, at approximately 12:00 p.m., CHP Sergeant Jon Cleveland and I began briefing for a street racing / "sideshow" detail. The detail was comprised of uniformed CHP officers driving marked patrol vehicles and plain-clothes officers driving unmarked patrol vehicles. The detail was in response to information CHP ISU received via social media postings regarding several Northern California car, truck, and off-road vehicle clubs traveling to Southern California to engage in unlawful "sideshow" activities. Local clubs from Southern California were also expected to participate in the event. I had been involved in investigating "sideshows" before July 3, 2016. During a "sideshow" (also called a "takeover"), the attendees illegally block street intersections, freeways, or parking lots to allow other vehicles to perform various unsafe and/or illegal driving maneuvers (e.g., speeding, "donuts," "burnouts," etc.) in close proximity to bystanders. Sometimes up to one hundred vehicles attend these illegal events. There have been fatal accidents at these illegal events. Sometimes the attendees throw rocks and bottles at police.

4.    After the briefing, Sergeant Cleveland and I were working as a two-man unit. We were both wearing plain clothes and black tactical body armor vests with police insignia and lettering in gold, and were assigned to an unmarked black Ford Taurus. The vehicle was equipped with a CHP radio system, siren, and a public address system. The vehicle was also equipped with emergency lights, including a steady red and flashing blue LED light which was suction mounted onto

the dashboard and flashing blue and amber LED lights which were mounted to the rear of the vehicle. Sergeant Cleveland was driving the Ford Taurus, and I was the passenger. Throughout the day, we patrolled sideshow meeting locations that had been pre-designated and posted on social media and provided intelligence to the marked CHP units to conduct enforcement stops.

5. At about 10:35 p.m., we followed a group of vehicles to the Santa Fe Springs Swap Meet parking lot. At that time, there were no marked CHP units in the area to assist with enforcement. I saw a red Chevrolet Silverado pickup truck performing "donuts" in the parking lot, which was a violation of California Vehicle Code section 23103(b). A "donut" is described as a vehicle's rapid acceleration, in combination with the application of the brakes, while the front wheels are turned, causing the rear wheels to lose traction and the vehicle to spin in a circular motion. We decided to conduct a traffic stop on the red Chevrolet Silverado pickup truck for reckless driving.

6. Sergeant Cleveland positioned our Ford Taurus behind the red Chevrolet Silverado pickup truck, activated the forward facing steady red and flashing blue lights, and began chirping the siren to conduct a traffic stop.

7. The red Chevrolet Silverado pickup truck hit a curb and then began backing up toward our Ford Taurus. Sergeant Cleveland placed the Ford Taurus in reverse in order to move out of the way of the red Chevrolet Silverado pickup truck. The red Chevrolet Silverado pickup truck then turned and drove toward a different exit. We followed the red Chevrolet Silverado pickup truck "Code-3" with full emergency lights and siren out of the parking lot. Shortly after the red Chevrolet Silverado pickup truck exited the parking lot, Sergeant Cleveland turned off the emergency lights and followed the truck in order to maintain surveillance on it while waiting for backup.

8. I advised CHP dispatch that we were following a speeding truck and requested assistance from a marked CHP vehicle. I contacted CHP Sergeant

3

1   Zavala, who was driving a marked CHP vehicle, and he said that he was on his way

2   to assist us. We continued following the red Chevrolet Silverado pickup truck at a

3   safe distance as we waited for a marked police unit to arrive. As we followed the

4   red Chevrolet Silverado pickup truck, I advised CHP dispatch of our changing

5   location. I also advised that we were in surveillance mode. I saw the red Chevrolet

6   Silverado pickup truck drive through a few intersections against red traffic lights

7   and reach estimated speeds of approximately 50-90 miles per hour at times on

8   surface streets. We continued to follow the red Chevrolet Silverado pickup truck at

9   a distance of approximately one quarter to three quarters of a mile. Sergeant

10   Cleveland only used the emergency lights and siren to clear some intersections

11   before going through them.

12       9.    At about 10:47 p.m., after we had followed the red Chevrolet Silverado

13   pickup truck on surface streets for several minutes, the truck turned north onto what

14   I later learned was North Pritchard Avenue. As we turned north on North Pritchard

15   Avenue, I saw the red Chevrolet Silverado pickup truck turn right on what I later

16   learned was MacArthur Avenue. North Pritchard Avenue dead-ends just north of

17   MacArthur Avenue. After the shooting, I learned that MacArthur Avenue is a

18   short, dead-end street. As we approached the intersection of Pritchard and

19   MacArthur, I saw that the red Chevrolet Silverado pickup truck had stopped.

20       10.   Sergeant Cleveland activated the Ford Taurus's the forward facing steady

21   red and flashing blue lights and stopped the Ford Taurus facing a slight

22   northeasterly direction near the intersection of Pritchard and MacArthur. At that

23   point, I thought the driver of the red Chevrolet Silverado pickup truck was either

24   going to give up or go running on foot. I got out of the Ford Taurus and drew my

25   firearm. I stood near the opened passenger's side door of the Ford Taurus, and

26   yelled, "Police. Stop. Show me your fucking hands." I saw Sergeant Cleveland in

27   my peripheral vision standing outside the Ford Taurus on the driver's side.

28   //

11.   The red Chevrolet Silverado pickup truck suddenly reversed at a high rate of speed, and I saw it hit struck the left side of a vehicle parked along the west curb of North Pritchard Avenue.  I saw at least the rear of the truck lift up approximately six inches when it hit the parked car.

12.   The driver of the red Chevrolet Silverado pickup truck then placed the truck in drive and drove directly toward Sergeant Cleveland while accelerating.  I believed that the red Chevrolet Silverado pickup truck was going to run Sergeant Cleveland over.  I saw Sergeant Cleveland diving to his left, but I did not think he could get out of the path of the truck fast enough.  I feared for Sergeant Cleveland's life.  In order to prevent the red Chevrolet Silverado pickup truck from running Sergeant Cleveland over, I fired a few rounds but saw that they were hitting the hood, and the truck was not stopping.  I then aimed higher and fired at where I estimated the driver to be.  I then saw the truck start to slow down, and I stopped firing.  A few seconds later, the truck coasted into the driver door of the Ford Taurus where I believed Sergeant Cleveland had just been standing.  Only a few seconds had elapsed from the time I stepped out of the Ford Taurus to the time shots were fired.

13.   After the shooting, I asked Sergeant Cleveland if he was alright and reloaded my firearm. I advised over the radio that shots had been fired ("11-99") and requested paramedics to respond to the scene ("11-41").  I requested that paramedics be expedited ("Step-up 41").  At that point, I noticed the passenger in the red Chevrolet Silverado pickup truck for the first time, and I could see that he was seated in the vehicle with his hands over his face.  I moved to the right rear of the Ford Taurus, and Sergeant Cleveland came up beside me.  Sergeant Cleveland and I kept our weapons trained on the passenger and the driver and waited for additional help to arrive.

14.   We gave commands to the passenger who got out of the truck and was taken into custody by other officers who had arrived at the scene.  After the

1  passenger was taken into custody, other officers began to arrive at the scene.

2  Sergeant Zavala, who was the first officer to arrive at the scene, suggested that

3  Sergeant Cleveland and I let the other officers that had arrived on scene handle the

4  situation.  I had no further involvement at the scene of the incident.

5      I declare under penalty of perjury under the laws of the United States of

6  America that the foregoing is true and correct.

7      Executed on June 19, 2018 at OAKLAND , California.

8

9                                    Richard Henderson

10  LA2017506261

11  13100701.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit E

1  Xavier Becerra
   Attorney General of California
2  Joel A. Davis
   Supervising Deputy Attorney General
3  Donna M. Dean
   Deputy Attorney General
4  State Bar No. 187104
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013
     Telephone:  (213) 269-6509
6    Fax:  (213) 897-2810
     E-mail:  Donna.Dean@doj.ca.gov
7  *Attorneys for Defendants*
   *State of California, Jon Cleveland*
8  *and Richard Henderson*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14 **ARMANDO VILLANUEVA AND HORTENCIA SAINZ, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO PEDRO VILLANUEVA, DECEASED, AND FRANCISCO OROZCO, INDIVIDUALLY,** | Case No. 8:17-cv-01302 JLS (KESx) |
| | **DECLARATION OF JON CLEVELAND IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Plaintiffs, | |
| **v.** | |
| **STATE OF CALIFORNIA; JOHN CLEVELAND; RICH HENDERSON; AND DOES 1-10, INCLUSIVE,** | Date:        August 10, 2018 Time:        2:30 p.m. Courtroom:   10-A |
| Defendants. | Judge:       Hon. Josephine L. Staton Trial Date:  Not set Action Filed: June 26, 2017 |

1

## DECLARATION OF JON CLEVELAND

I, Jon Cleveland, declare as follows:

1.     I am employed by the California Highway Patrol (CHP) as a supervisor in the Vehicle Theft Unit of the Southern Division Investigative Service Unit (ISU) and am a peace officer under state law.  I held this position in July 2016.

2.     The matters set forth herein are within my personal knowledge, and, if called to, I could and would testify competently regarding the matters.

3.     On July 3, 2016, at approximately 12:00 p.m., CHP Officer Richard Henderson and I began briefing for a street racing detail.  The detail was comprised of uniformed CHP officers driving marked patrol vehicles and plain-clothes officers driving unmarked patrol vehicles.  The detail was in response to information CHP ISU received via social media postings regarding several Northern California car, truck, and off-road vehicle clubs traveling to Southern California to engage in unlawful "sideshow" activities.  Local clubs from Southern California were also expected to participate in the event.  I had been involved in investigating "sideshows" before July 3, 2016.  During a "sideshow" (also called a "takeover"), the attendees illegally block street intersections, freeways, or parking lots to allow other vehicles to perform various unsafe and/or illegal driving maneuvers (e.g., speeding, "donuts," "burnouts," etc.) in close proximity to bystanders.  Sometimes up to one hundred vehicles attend these illegal events.

4.     After the briefing, Officer Henderson and I were working as a two-man unit.  We were both wearing plain clothes and black tactical body armor vests with police insignia and lettering in gold, and were assigned to an unmarked black Ford Taurus.  The vehicle was equipped with a CHP radio system, siren, and a public address system. The vehicle was also equipped with emergency lights, including a steady red and flashing blue LED light which was suction mounted onto the dashboard and flashing blue and amber LED lights which were mounted to the rear of the vehicle.  I was driving the Ford Taurus, and Officer Henderson was the

2

passenger. Throughout the day, we patrolled sideshow meeting locations that had been pre-designated and posted on social media and provided intelligence to the marked CHP units to conduct enforcement stops.

5. At about 10:35 p.m., we followed a group of vehicles to the Santa Fe Springs Swap Meet parking lot. At that time, there were no marked CHP units in the area to assist with enforcement. There were approximately twenty vehicles in the parking lot. I saw a red Chevrolet Silverado pickup truck performing "donuts" in the parking lot, which was a violation of California Vehicle Code section 23103(b). A "donut" is described as a vehicle's rapid acceleration, in combination with the application of the brakes, while the front wheels are turned, causing the rear wheels to lose traction and the vehicle to spin in a circular motion. I decided to conduct a traffic stop on the red Chevrolet Silverado pickup truck.

6. As we entered the parking lot, an unknown car started honking, which I believe was someone alerting the attendees that law enforcement had arrived. The red Chevrolet Silverado pickup truck then drove toward the exit where we had just entered. I positioned my Ford Taurus behind the red Chevrolet Silverado pickup truck, activated the forward facing steady red and flashing blue lights, and began chirping the siren to conduct a traffic stop.

7. The red Chevrolet Silverado pickup truck hit a median and then began backing up toward my Ford Taurus. I placed the Ford Taurus in reverse in order to avoid being hit by the red Chevrolet Silverado pickup truck. The red Chevrolet Silverado pickup truck then turned and drove toward a different exit. I estimate the speed of the red Chevrolet Silverado pickup truck in the parking lot to be approximately 50 miles per hour. I followed the red Chevrolet Silverado pickup truck "Code-3" with full emergency lights and siren out of the parking lot. Shortly after the red Chevrolet Silverado pickup truck exited the parking lot, I turned off the emergency lights and siren and followed the truck in order to maintain surveillance on it while waiting for backup.

3

8. I heard Officer Henderson advise CHP dispatch that we were following a speeding truck and request assistance from a marked CHP vehicle. I continued following the red Chevrolet Silverado pickup truck at a safe distance as I waited for a marked police unit to arrive. As we followed the red Chevrolet Silverado pickup truck, it drove through a few intersections against red traffic lights and reached estimated speeds of approximately 70-90 miles per hour at times on surface streets. We continued to follow the red Chevrolet Silverado pickup truck at a distance of approximately one quarter to three quarters of a mile. I only used the emergency lights and siren to clear some intersections before going through them.

9. At about 10:47 p.m., after we had followed the red Chevrolet Silverado pickup truck on surface streets for several minutes, the truck turned north onto what I later learned was North Pritchard Avenue. As I turned north on North Pritchard Avenue, I saw the red Chevrolet Silverado pickup truck turn right on what I later learned was MacArthur Avenue. North Pritchard Avenue dead-ends just north of MacArthur Avenue. I later learned that MacArthur Avenue is a short, dead-end street. As we approached the intersection of Pritchard and MacArthur, I saw that the red Chevrolet Silverado pickup truck had stopped.

10. I activated the Ford Taurus's emergency lights and stopped the Ford Taurus facing a slight northeasterly direction near the intersection of Pritchard and MacArthur. Uncertain of the intentions of the driver of the red Chevrolet Silverado pickup truck, I got out of the Ford Taurus and drew my firearm. I stood near the opened driver's side door of the Ford Taurus, and I could hear Officer Henderson yelling commands to the driver of the red Chevrolet Silverado pickup truck.

11. The red Chevrolet Silverado pickup truck suddenly reversed at a high rate of speed, and I saw it hit the left side of a vehicle parked along the west curb of North Pritchard Avenue. I saw at least one of the rear tires on the truck come off the ground when it hit the parked car.

//

4

12.   The driver of the red Chevrolet Silverado pickup truck then placed the truck in drive, turned his wheels to toward where I was standing, and drove directly at me.  I believed that the red Chevrolet Silverado pickup truck was going to run me over.  The truck continued to turn toward me as I started to move quickly to my left to get out of the path of the truck.  I feared for my life.  In order to prevent the red Chevrolet Silverado pickup truck from running me over, I aimed at where the driver would be sitting in the truck and fired two shots as I moved to get out of the path of the truck.  The truck ultimately collided into the driver door of the Ford Taurus where I had just been standing.  No more than five seconds elapsed from the time I stopped the Ford Taurus to the time shots were fired.

13.   After the shooting, I asked Officer Henderson if he was alright, I then reloaded my firearm, and then I moved to the right rear of the Ford Taurus and was able to see into the windshield of the red Chevrolet Silverado pickup truck.  I heard Officer Henderson advise over the radio that shots had been fired and request paramedics to respond to the scene.  At that point, I noticed the passenger in the red Chevrolet Silverado pickup truck for the first time, and I could see that he was seated in the vehicle with his hands over his face.  I also noticed that the driver's side window was partially open.  Officer Henderson and I kept our weapons trained on the passenger and the driver and waited for additional help to arrive.

//

//

//

//

//

//

//

//

14.   We gave commands to the passenger who got out of the truck and was taken into custody by other officers who had arrived at the scene.  After the passenger was taken into custody, other officers began to arrive at the scene.  I put on gloves to go check on the driver, but Sergeant Zavala, who was one of the first officers to arrive at the scene, suggested that Officer Henderson and I let the other officers that had arrived on scene handle the situation.  I had no further involvement at the scene of the incident.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 20, 2018 at Los Angeles, California.

Jon Cleveland

LA2017506261
13100680

Exhibit F

**INTERVIEW OF ERIC HULBERT**
**Q=YUN ZHOU**
**Q2=LEO SANCHEZ**
**Q3=BRIAN GABRIEL**
**Q4=AUTREY JAMES**
**Q5=JAMES MORRIS**
**A=ERIC HULBERT**

Q:          It is 21:05 hours. I am Sergeant Yun Zhou with Oakland Police homicide officer involved shooting team. We are at 3601 Telegraph. This is an audio interview of… I'm sorry, is it officer or sergeant?

A:          Officer.

Q:          Officer Eric Hulbert.

A:          Hulbert, yes.

Q:          To my right is…

Q2:        Sergeant Sanchez, investigator of the officer involved shooting team.

Q6:        Ian Chevier. I'm an officer on the California Highway Patrol and California Association of Highway Patrol representative for Eric Hulbert.

A:          Eric Hulbert.

Q4:        Autry James from Alameda County District Attorney's Office.

Q5:        James Morris, Alameda County District Attorney's Office inspector.

Q7:        Sergeant Fernando Varientos, ID 18962 with the California Highway Patrol.

Q8:        Lieutenant George Goreme, ID 13309 California Highway Patrol.

Q9:        Investigator Robert Rich, the California Highway Patrol 20407.

Q:          Thank you. Officer Hulbert, how do you spell your last name?

A:          H-U-L-B-E-R-T.

Q:          Okay. So Officer Hulbert, I'm gonna read you this advisement.

A:          Okay.

Q:          I'll make sure you understand it, okay? You are not required… I'm sorry. You are not required to answer any questions. And are you willing to provide a voluntary statement?

A:          Yes.

Q:          Okay. Officer Hulbert, your first name's Eric?

A:          Eric.

Q:          Is that with a C or a K?

A:          C. E-R-I-C.

was. Diehl had me go off that way and basically Henderson took the exit before or whoever… Montour was driving his truck and they took the exit before. And then basically we started patrolling different side streets there and then as we're driving around, we hear Henderson's car put out that… I think they ran a plate over the… over their MDC or over air and it came back to a lost or stolen plate and he put out that "hey, we're behind a red or maroon Dodge Challenger Hellcat. And immediately I recognize that as one of the cars that had been taken from the San Leandro Dodge dealership. I didn't know if it was that exact car but it resembled one that was recently taken. So he put out… I don't recall exactly where they started putting out their traffic because Diehl was helping navigate towards them, then I ended up hearing them… they were in the area of 94th St. And then I… at this point I was about Bancroft… I was on Bancroft, just approaching 98th St. And then I see Kirby in the marked black and white, he is coming down 98th and goes through the intersection, 98th and Bancroft. So Diehl and I were both like well, hey, they know the area because Case is with them and Case worked Oakland, so they knew the area. He's like "hey, let's just get behind them. We'll follow them to wherever Henderson's car is putting out the information." So I get in behind them and I remember hearing Henderson say that he was on Cherry around 96th. So we… I see Kirby turn right onto Cherry, so I just keep following him. And then I could have sworn I heard Henderson say that the vehicle blacked out and possibly parked. But I wasn't too sure on that. And I think actually Greg Ramos ran the license plate in our car, too, so I know that alerted dispatch and they were asking because anytime we get a lost or stolen plate hit, they start asking "hey, what's going on?" because it could be a stolen vehicle or whatever. So Kirby's going up and then I start seeing some lights coming and then all of a sudden I see Kirby activate his lights. And then I can't really see on the other side of Kirby because his lights are flashing and it's kind of hiding the cars that are in front of him and them I'm… Diehl and I… Diehl goes "hey, let's jump out in case they… in case something body foot bails, if this is a stolen car or whatever." So I put the car in park. I go out the driver's side, I think I left my door open. And I run up basically along the parked cars that are there and as I'm approaching, I see Kirby continue to move forward a little bit and then I see the red Challenger… I just see it reversing. Next thing I know is that car hits Henderson's car and… or truck, I don't know if it another car or not but I see it hit Henderson's truck and then basically I hear that thing like loud exhaust, just open wide up, just wahhhh. And I'm think… first thing in my mind is I'm thinking man, this is a super fast car and it's got a lot of horse power, it's loud as can be. And basically as I'm… I'm looking right at the car and I see the driver, and that's like… I didn't see anybody else in the car, the first thing I see is this drive and he's just… I swear we locked eyes. And he's just looking at me calm as can be and he's coming towards me, my like area, and he's coming right towards Kirby's car. So at some point, I moved to the curb… or the sidewalk, rather, so… because I didn't want to be in the way, in case he comes this way. And I see him hit Kirby's car and I was pretty sure Kirby was in the car, I mean he hit it pretty hard. At one point during this whole thing, I see the Challenger just rock up and then it keeps going and at this time I'm thinking like Kirby's in danger, too, because this car is just come right at him but I don't have a clear shot because Kirby's right… I mean, they were literally like right next to each other, so he's in my way. So then the car scrapes past Kirby and continues going and then I see… like I'm moving up to try and keep sight on this guy because he's like trying to get away and he's still full throttle, basically, is what I… I can hear engines roaring. And he keeps going up. I look up to my right and I see Diehl and he's just right in the line of this guy's sight. And then I look back over at the car, he's still going and I didn't see Diehl anymore so I didn't know… because they were… I mean, they were so close, I didn't know if Diehl got out and I'm just thinking "oh fuck, this guy just… he just killed Diehl." Like, I don't know if Diehl's underneath his car or what's going on. So I started shooting at the driver and basically the car comes to a stop because it hit another car, it hit my truck and I still don't know where Diehl is. There's smoke everywhere. I continue to fire because I can hear this thing… just like, this guy's trying to get away still and it's like revving up and down, the car's shaking… or not shaking but like rocking up and down because like this guy's throttling in and out of the pedal. And then all of a sudden I just… I hear the engine just one solid scream, I mean it's just going. Tire smoke really starts coming and then I move over a little bit more, because at this time I'm like right behind the line of the door basically, where the door ends, you know? I'm basically right there and I look over and I can see the driver, he's just back and done so I stopped shooting at that point because I knew he was incapacitated and wasn't able to go anywhere. And then all of a sudden I start seeing some more movement in the car and I learned there was a passenger. At this point, I see… Suputa (unintelligible) is… we basically converge together and he's like "hey, step back just in case this guy…" because we don't know what's going on, we don't know who's in the passenger seat. So we kind of step back for a minute and trying to assess ourselves. I had to do a… I did a reload at some point and then… and then Suputa and I start talking and the passenger actually sits up at this point and I knew… we knew for sure there was a passenger and we're yelling because the engine's still going. I mean, it's just racing… the engine's racing, tire smoke. It fills up the whole… I mean, we couldn't even see half of what was going on on this other side. So I was yelling at the passenger "hey, shut the car off" and all that. And she ends up… at one point, the engine

1    A:        Because I saw he turned on his lights. So I know it's his car and I know there was three people in that
2              car, so I'm just… I know during an incident like this, that's something we wouldn't let other people,
               so basically just…

3    Q:        When you say he turn on his lights, what do you mean by that?

4    A:        Well, so…

5    Q:        I mean, what kind of lights we're talking about?

6    A:        He turned on his emergency lights, so his red and blue police lights, at some point when he… after
               Kir either… same time Kirby turned on his or just after or something, he turned on his lights.

7    Q:        Okay. And Kirby's lights, can you describe Kirby's lights?

8    A:        Yeah, I'm pretty sure he has a… it's an overhead LED light bar and it basically has red and blue lights
9              on there. On the back it's got yellow… it's got like yellow lights and it's got blue lights on the back.

10   Q:        Okay. And you… you believe Kirby's in the car, are you certain or you're not certain?

11   A:        I'm not certain, at this time. I'm pretty sure, based on the time that all this happened. I don't think he
               had time to get out of the car because like I said the Challenger goes back up and Kirby kind of moves
12             forward to kind of get him to stop, basically. And I think by the time that he took off to come forward,
               I don't think Kirby had time to get out of the car.

13   Q:        Okay. And then after that, you said they kept going, right, the Hellcat kept going.

14   A:        Correct.

15   Q:        But then you said you look right and you say Diehl.

16   A:        Yes.

17   Q:        So… are you able to… we're gonna kind of ignore vehicle positions at this point right now… do you
               know roughly, one, where you were? And two, where roughly you saw Diehl?

18   A:        Yeah, so, I mean at this time, I'm right in this general area.

19   Q:        Can you put an E right here, saying that's you?

20   A;        Yes.

21   Q:        And then roughly to general… well, the general area for Diehl.

22   A:        So Diehl… I see Diehl like in this general area.

23   Q:        Okay. Can you put a D for Diehl?

24   A:        Yes.

25   Q:        And where is Diehl, in relations to your silver Ram?

26   A:        So, I mean, my perspective of it, I was thinking Diehl was basically on the… it'd be on the driver's
               side in between my truck and whatever parked car was next to my truck at that time. So I was thinking
27             he was just right in the middle of those, in that area.

28   Q:        So obviously this placement of the silver Ram is incorrect?

29   A:        Correct. I believe, like I said, it's centered… it's more centered of the road. Like…

30   Q:        Yeah. Could we draw this? And you say Kir… I'm sorry, you say Diehl was closer to the driver's side
               of the…?
31

1  A:      Yeah, he was... I mean, on the driver's side. He wasn't on this passenger side, he was on this driver's side of the area.

2

3  Q:      And when you say driver's side, I might be misinterpreting. Are you meaning by the driver door or you just mean in general?

4  A:      No, in general.

5  Q:      Okay.

6  A:      In general. He's on the left side of the truck.

7  Q:      Is he closer to the bed of the truck or is he closer to the cab of the truck?

8  A:      Yeah, I'm thinking he was closer to like where the rear tire is. That's the area that I had thought I saw him.

9  Q:      Got it. Okay. And at this point, where is the Dodge Challenger Hellcat?

10  A:     So basically at this point, the Dodge Challenger Hellcat is like right in this general area.

11  Q:     Okay. Can you put Hellcat in front of that?

12  A:     Yes, sir.

13  Q:     Okay. Are you able to estimate the distance between the Hellcat and Diehl when you first caught sight of Diehl?

14
15  A:     When I first caught sight of Diehl, it's maybe... I would say between... either a car length or less, when I see Diehl.

16  Q:     Okay. How fast or slow was the Hellcat moving?

17  A:     This thing's moving fast. I mean, he was... like I said, it's a really fast car and he was full throttle, basically, is what it sounded like. So he's going fast.

18  Q:     Are you able to give an estimate?

19  A:     I can't. Everything happened so fast. I mean, with... it's hard to say because I have cars that are still and I have just this one car coming towards us and I'm more worried about Diehl than I am like how fast... I mean, I know it's moving fast.

20

21  Q:     Is there space for this Hellcat to drive around Diehl?

22  A:     No.

23  Q:     Okay. At what point did you draw your weapon?

24  A:     I drew my weapon out before... as I got out of my car is when I drew my weapon out.

25  Q:     Okay. And when we say weapon, I'm gonna clarify. Was it your duty pistol?

26  A:     Yes, it was my duty pistol.

27  Q:     And at what point did... at what point in this sequence of events did you begin shooting?

28  A:     I began shooting, I mean, right about in this... at this time is what I believe is when he's approaching Diehl... is when I started shooting.

29  Q:     So, you saw Diehl and then you saw the Hellcat. Are you aware of the positioning of any other officers at this point?

1            I'm thinking he's gonna kill Diehl. So that was, at my time, that's… and how quickly it happened, that was my… my option.

2

3
Q:         And then you say the passenger sits up at some point. Could you tell what she was doing, just prior to that?

4
A:         I couldn't. So… well, just prior to her sitting up, I mean like… I said I can kinda… I start seeing her move… or something move in the passenger seat. And then Suputa and I… because at this point the

5
engine starts revving up and we kind of realize that the threat's done so Suputa and I start… we start buddy checking each other, make sure that we're both okay, we're not hit and stuff like that. And we

6
back up a little, just in case somebody does have a weapon. And then that's when we see her actually sit up all the way.

7
Q:         Did the suspect have any reaction to your fire? I might have asked that.

8
A:         I mean, not that I saw. Like when I was firing, the whole time I can… the only reaction that I can hear is that he's still trying to get away. The engine's pulsing up and down. So I mean that's the only

9
reaction that I was getting.

10
Q:         Before I move on to (unintelligible) this portion.

11
Q2:       Before you move on to where?

12
Q:         Before I move past the (unintelligible).

13
Q2:       Yeah, I got a few questions here. Let me see this one right here.

14
A:         Yes.

15
Q2:       We'll concentrate on the last one right here. Make sure I don't mark it. So this marker right here, who is this?

16
A:         This is Diehl.

17
Q2:       Okay.

18
A:         Well, this is just his initial, like this box would be Diehl.

19
Q2:       This box right here would be Diehl, okay.

20
A:         Correct.

21
Q2:       All right. Where was Diehl… again, I know you've told me… just for the clarity, where was Diehl in the silver Ram?

22

23
A:         So he was in the right-rear seat.

Q2:       Okay. When you made the decision to get out of the vehicle, was it a conscious… was it like a team

24
decision between everybody in the car or was it just your independent decision?

25
A:         No, it was a team decision. Basically, as we're pulling up, Diehl was like "hey, we need to get out in case this guy takes foot bail" or whoever's in the car takes foot bail.

26
Q2:       Right.

27
A:         So it's a conscious decision. I throw the truck in park and as far as I know, everybody's getting out, at

28
this time.

29
Q2:       Okay. So as Diehl is getting out, you're getting out… and who else was in the car?

30
A:         Greg Ramos.

31
Q2:       He's in the right-front passenger side?

1   Q2:         We're not asking you to narrow it down to a time but it's important to know how much time you had
                to make these decisions. So when you got out of the vehicle to the point where you stop shooting, this
2               whole situation, how long did it last?

3   A:          I mean, this whole situation, if I'm thinking of it… I mean, it's gonna be like 20 to 30 seconds, if even
                that. I mean, it's happening… it's boom, boom, boom… everything's like just happening. So I mean
4               there's not a lot of time to use different options or go through different options. I mean, it's this or
                it's… something dire is going to happen, type of thing.

5   Q:          Did the passenger make any statements toward you?

6   A:          Not initially… not until we started pulling her out. That's when she started making statements to us.

7   Q:          What'd she say?

8   A:          When… I want to say… because I'm yelling at her to shut the car off because I can hear it going and I
                don't know if she was saying "I can't." I know at one point she was shot. We pulled her
9               out of the car and when we pulled her out, like I said, for some reason she made a statement twice
                about her having an abortion. And then she had kept telling us that she was shot.
10

11  Q:          Were you aware of anybody else having… well, were you aware who else also shot in this incident?
                Or they fired their service weapons?

12  A:          I mean, until afterwards, once we started checking everybody… I mean, for sure like right after it
                happened, I know it was me and Suputa. I mean, because we were right next to each other and we
13              were checking each other. He's like "hey, make sure you reload" this and that. And then… I mean,
                after the fact then I found out that Henderson shot as… Henderson shot, as well. But I mean during
14              the firing, I mean I… I mean I'm mainly focused on the car and the driver and… like my zone area
                there, I guess.
15

16  Q:          And I apologize, I want to take you back to when the Hellcat collided into your truck.

17  A:          Okay.

    Q:          How significant was that? If you ever saw it.
18

19  A:          I mean, what do you mean "how significant was it"?

20  Q:          Like was there any… was there any significant damage or…?

21  A:          Yeah, I mean I know it took… it put a pretty big dent in my door. I can't even open the door. The
                fender… it basically like scraped up alongside of it. I mean, after the fact, I'm looking at it and there's
                red up towards the window of my door so I know it kind of scraped along that side.
22

23  Q:          And when you say "red towards the window" what do you mean by that? What window and where is
                it?

24  A:          So like the driver's side door, just below like the main window… like below the mirror a little bit,
                there's like a red scuff mark. Like it kinda pushed… I mean, it pushed up along there.
25

26  Q:          And you say below the mirror, which mirror are you referring to?

27  A:          The side mirror.

28  Q:          Okay. And how far below, if you can estimate that?

29  A:          It's probably like 6 inches, maybe, below the mirror.

30  Q:          Okay. Following this entire incident, were you sequestered? If you know what that means. Were you
                placed with another officer and taken… separated from the other officers?

| | | |
|---|---|---|
| 1 | A: | Yeah, I was separated from everybody. I mean, there wasn't a whole lot of place to go so Sergeant Henderson and Officer Suputa and I, we all got put into his vehicle and we were kind of just left at the scene while everybody else was out and about. |
| 3 | Q: | Who were you… who was in… who were sequestered with? Is anybody else inside that vehicle? |
| 4 | A: | No, not at the… at different time, I think Sergeant Pacheco would come in and sit at the door with us. But I mean, she had other duties to do. |
| 5 | Q: | Now where were you taken after the incident? |
| 6 | A: | After the incident, we were basically… we were taken back to the CHP office here. |
| 7 | Q2: | Just for uniformity, a question I've asked the other two interviews is this: I just want to take one factor out, that's the only thing… if Diehl was not here, if Diehl was not here, he was somewhere else or anywhere but you didn't see him here and the car crashed and did everything it was supposed to do… or anything that did happen except for Diehl being here, what would have been your actions… what would have been more like the next steps happening on this type of scenario? |
| 10 | A: | I mean, for me, if I… if I didn't think Diehl was dead or gonna… or something happen to him, I mean we would have had to try and basically detain this person in this car. I mean, so we would have been giving commands and stuff like that… and try and get him to stop trying to escape. I mean, I don't know… |
| 12 | Q2: | The other options you had, the other resources you had, would you have been able… had more time to consider those other options? |
| 14 | A: | Yeah, if I didn't have to fear for him, we would have had more time. I mean, I know people there have tasers. I know people there… we had less lethal shotguns there. So I mean there's definitely different options we could take if we have more time and we don't think… I mean, the severity… I mean, like we don't think life is in danger, we have a lot more time. |
| 16 | Q2: | Understood. |
| 17 | Q: | Would you have discharged weapon? |
| 18 | A: | No. I mean, if I didn't think Diehl was dead, I mean… there's no… I mean, there's no reason to. I mean, it's basically at that point it's somebody trying to escape. I mean, they caused… it'd be like a pursuit or whatever. I mean, I've been in situations where this has happened before, where people have gotten rammed and I've never had to fire my weapon. |
| 20 | Q2: | One more question, just to go back a little bit. The way this traffic enforcement stop ended up, was that by plan or was this kind of like just a bad circumstance at how it ended up because of some direction was given? |
| 22 | A: | I think it was just like the best circumstances how it ended up, it was no… it wasn't a pre-planned event. I mean, like I said, Sergeant Henderson was behind the car and he's giving out like directions and stuff. And then we have Kirby… I know Kirby hasn't worked Oakland before so he's not super familiar with the streets but he does have Case with him, who's worked Oakland. And for me, I just got behind them because I knew Case was in the car so they know the area. |
| 25 | Q2: | Gotcha. |
| 26 | A: | But I mean, it was no… it's not an ideal situation because of crossfire so we don't plan… we don't normally practice… I mean, this isn't something we practice. |
| 28 | Q2: | I understand. |
| 29 | A: | So I mean, it's not an ideal situation or planned. |
| 30 | Q2: | Okay. Okay. |
| 31 | Q: | I'm good. You guys want to take a break before (unintelligible). |

Exhibit G



Exhibit H

**INTERVIEW OF MICHAEL DIEHL 1**
**Q=YOUN ZHOU**
**Q2=LEO SANCHEZ**
**Q3=ROSETTE**
**Q4=RICH**
**Q5=PAUL WILLET**
**Q6=TODD MORK**
**A=MICHAEL DIEHL**

Q:      Okay. It is June 7. 5:22 in the morning. I'm Sergeant Youn Zhou with OPD homicide. We are in the captains office in OPD police building, CID section. To my right is…

Q2:     Sergeant Sanchez 8181 Charles, OIS investigator.

Q3:     Sergeant Rosette 17216 with CHP.

Q4:     Investigator Rich CHP 20407.

A:      Investigator Michael Diehl. ID 20633.

Q5:     Paul Willet, district director for district 2 California Association of Highway Patrolman.

Q6:     Lieutenant Todd Mork 8173 homicide commander.

Q:      Okay, Officer Diehl or Detective Diehl? (Unintelligible).

A:      I'm investigator.

Q:      Investigator Diehl. What is the correct spelling of your last name, I want to make sure I have it right.

A:      D-I-E-H-L

Q:      Okay. So just a couple admin… a couple questions. How long have you been hired by the California Highway Patrol?

A:      As a peace officer, I guess, it was from May of 2013. So about six… what is that, seven years now.

Q:      And where… what is your current assignment?

A:      I'm assigned to the organized retail crime task force.

Q:      Organized retail crime task force. And how long has that assignment been?

A:      Since October of last year, so October of '19.

Q:      Do you have any auxiliary assignments with the CHP?

A:      That's…. no, that's my current assignment.

Q:      Okay. And then, at the time of the incident, are you working as a regular detail to the talk force or you working something… some other thing?

A:      I'm assigned… because of the George Floyd protest, I'm assigned to kind of like a joint unit.

Q:      Can you kind of briefly explain from… the aim and goal and purpose of this joint unit?

A:      So, working undercover, we were to be monitoring the flow of protesters. Once that concluded, yesterday there was a 246 vehicle, which came down to East Oakland, so our primary objective was to

| | | |
|---|---|---|
| 1 | A: | After that, I came up here, started doing rollcall, making sure everybody was accounted for. I asked |
| | | Sergeant Henderson if he was okay. People were already attempting to render aid to the victims… or |
| 2 | | in this case, the occupants of the Dodge. I asked Sergeant Henderson what he wanted me to do. He |
| | | wanted me to insure that everybody was accounted for, at that point. And then we were… the driver |
| 3 | | wasn't responsive, so then I attempted to get him to the Dodge truck because we couldn't access |
| | | through the driver door and I moved it out of the way so that way we could get the driver out and |
| 4 | | begin rendering aid. |
| 5 | Q: | When you say you moved the Dodge truck out of the way, how did you do that? |
| 6 | A: | I had to climb through the passenger side, over the center console and I backed out of the way, so that |
| | | way we could actually access the driver's side door because the driver's side door I think was pinned |
| 7 | | against the truck bed… the driver's side bed of the truck. It was in that vicinity. |
| 8 | Q: | So, the CHP K9 car, do you recall roughly where it was on the scene? I mean… |
| 9 | A: | At the time, we were directly behind it. There was probably about three to five feet from where we |
| | | stopped behind the CHP K9 car. |
| 10 | Q: | So did anybody ever move the K9 car? |
| 11 | A: | No. |
| 12 | Q: | No. Okay. And then the pickup truck… the Dodge pickup truck, you said you had to back it up to get |
| | | access to driver door. Did anybody ever drive it back toward the K9 car or was it just left the way it |
| 13 | | was? |
| 14 | A: | So I backed it up to create space and then I think I repositioned it somewhere over here and then |
| | | pulled it forward, back up closer to the north side of Cherry, so that way we could get space because |
| 15 | | there was already people coming in behind us. |
| 16 | Q: | Got it. So, to the best you can, could you describe the position of the pickup truck that you were in, in |
| | | relation to the K9 car and the final resting position of the Dodge, before it was all moved for you to |
| 17 | | get access? Meaning where it was at the time of the shooting. |
| 18 | A: | At the time of the shooting, we were… I'll just go with my hand, so K9 car, our car. We were back to |
| | | back. Like in a straight line, like the flow of traffic. |
| 19 | Q: | Okay. |
| 20 | A: | And like I said, it was about three to five feet. |
| 21 | Q: | And then the driver's side door that you couldn't access on the Dodge, what part of the truck was |
| 22 | | obstructing it? |
| 23 | A: | The entire car. |
| | Q: | I guess my question would be, was it closer to the bed or was it closer to the cab? |
| 24 | | |
| 25 | A: | It was closer to the rear end because I remember you could… you could probably, if you walked from |
| | | the nose of the car towards the rear, you could probably get to like the front wheel but you couldn't |
| 26 | | get any closer than that. Is that your… what you're asking? Okay. |
| 27 | Q: | So while you were between your pickup truck and the K9 vehicle, or somewhere in that vicinity, |
| | | before the shooting, could you tell the Dodge drove past you or could you tell at what point past |
| 28 | | you… if it ever drove past you? |
| 29 | A: | When I looked… after I heard the first impact and I looked back, that's when I saw that he wasn't |
| | | coming at me and he was going towards the right. Is that what you're asking? |
| 30 | Q: | So at some point you thought he was coming at you... |
| 31 | A: | Yes. |

Q:      And that's what caused you to go back.

A:      Yes.

Q:      And then you realized… and then at some point you also realized it went to the right, as opposed to coming right at you?

A:      Correct.

Q:      During this incident, could you tell where any of your officers… any of your fellow officers were or no?

A:      No.

Q:      Okay. And you only… you knew people's position after the shooting? Or at least relative to the ones you…

A:      After the smoke settled from the tires spinning, that's when I could start seeing people again.

Q:      Tell me about the tire smoke, like how… describe it to me. How bad was it? Was it not…

A:      You had maybe three feet of visibility in front of you. Because as he accelerated through, he got wedged between the car and he just full throttle was trying to get through the car. There was no stopping, he was just burning rubber, trying to force his way through… through the cars.

Q:      Could you tell... how many occupants was in this Dodge?

A:      The only person I was looking at was the driver. Because like I said, I was… we were head-on with him and I was just trying to see if… you know, people will look where they're going, that's the only person I was focusing on to see if he was gonna come at me or go the other way. So that's the only person I was focusing on.

Q:      Can you describe the driver to me?

A:      I saw he was a light-complected male. He either had really long black hair or he was wearing a black beanie with a black top… or shirt, blouse, sweatshirt.

Q:      During this incident, did you see anyone inside the Dodge with a weapon or (unintelligible) any type?

A:      I think the vehicle can be interpreted as a weapon.

Q:      Right.

A:      Yeah.

Q:      But did you see any like… did you see firearm, any sort of any other weapons?

A:      No, I didn't stick around long enough to try and look for that.

Q:      Oh, I'm sorry, one more thing. Did you know who ran that stolen vehicle plate? Or how that came to you guys?

A:      I believe… I initially heard it because our dispatch broadcasted it and I believe she said King 3 which is the K9 unit. So we heard it on CHP radio and we were the only… my car and the K9 unit were the only ones with CHP MDCs.

Q:      Okay. Are you aware of any other CHP in that particular area, East Oakland, at that time or you guys…?

A:      No, we were the only ones, to my knowledge.

Q:      Okay.

A:      It would have been along lines of "stop" "turn the car off" "police, turn the car off. Stop."

Q2:     And I'm sure you're... I'm assuming you were saying it much louder than you're telling us right here.

A:      Yeah.

Q2:     Could you hear other officers... maybe you didn't see them, but could you hear other officers giving similar type of commands?

A:      Yes.

Q2:     Okay. How long... and I know you said this happened so fast, so that's why... how long were these commands being given until you took the next action?

A:      Maybe five seconds, maybe.

Q2:     Okay. Could you see the suspect?

A:      Yes.

Q2:     Do you... or, do you know or do you think he saw you?

A:      I know he saw me.

Q2:     How do you know that?

A:      Because I was standing... I was standing to the right, like I said, behind the door with the door... I don't remember if the door was open or closed but I was standing at... right in that front area and he looks... he was looking at me, he was looking to the right, I don't know what or who he was looking at to the right... his right, my you know... yeah.

Q2:     Your left, his right.

A:      Yeah. He was looking all around. He was looking at all of us... I'm assuming all of us but I know he saw me. And I know for sure he obviously saw the red and blue lights and the cop car in front of him.

Q2:     Okay. And then you said he started revving the engine but it wasn't moving... was it moving or just revving the engine?

A:      It was revving the engine.

Q2:     Okay. So... the only way that I know... and again, do you guys know more about cars in CHP than I do, is there any other way to rev the engine other than physically putting your foot on the gas and pressing it down?

A:      If you're... kind of... if it's a stick shift, if you're revving kind of like almost like a warning, I guess, before you put it in gear or you have your foot on the brake, attempting to build up power before you accelerate at a high rate of speed.

Q2:     Okay. And have you been in a situation where you've seen vehicles rev their engine like that?

A:      Yes.

Q2:     Okay. And what takes place, usually, after that? Is it... are they doing that to build up energy or...?

A:      Yes.

Q2:     Okay. And then you said that... I want you to kind of explain this to me. You elected then to turn around and run. I want you to tell me why did you elect to turn around and run, if that's what you did. And what was it that made you stop doing the felony car stop, like you said you were doing, and now turn around and run? That's what I'm really trying to focus here on.

A:      So, I knew at that point when he was looking around, he was not going to follow commands. I knew with the power of that vehicle, that just because I was between the CHP vehicle and the parked vehicle, if for some chance the momentum forced that car out of the way, I would have been underneath that car. And obviously if he was willing to hit me, he wouldn't have stopped and I would have been drug underneath that car and I wouldn't have gone home. So I elected to run backwards to take a different point of advantage, maybe get to the curb, which I couldn't get to. Again, like I said, there was nowhere else for me to go, which is why I elected to retreat backwards and attempt to get over the vehicles in case he forced his way through the CHP vehicle and the parked car and hit me.

Q2:     Okay. All this is happening in a matter of… how many seconds?

A:      I couldn't even tell you. Maybe 15-20 seconds.

Q2:     Okay. Did you think your life was in danger?

A:      A hundred percent.

Q2:     Okay. Your fellow officer's life in danger?

A:      A hundred percent.

Q2:     Any civilians, whether you seen them or not, could walking up and down the sidewalks or other vehicles, could they have been in danger?

A:      Yes, a hundred percent.

Q2:     So you said you had to… you believe or you're not sure that you hopped on the hood of a parked vehicle or another vehicle, can you explain that?

A:      So I remember throwing my radio onto the hood of a car and like I said, I was… adrenaline kicked in at that point and I don't remember if I hopped completely on top of the hood of the car or I began to, but I know the attempt was made.

Q2:     Okay. When the vehicle is revving it's engine, is it creating smoke?

A:      At that point, I don't remember.

Q2:     Okay. You said you looked around for your partners, your other people involved.

A:      Yes.

Q2:     You didn't see anybody?

A:      No.

Q2:     What was going through your mind when you didn't see anybody?

A:      I thought that my partners were on the opposite side of the car, so I guess you could say on the south side of Cherry. I thought they were on the opposite side of the car, between the CHP vehicle… K9 car, and the parked cars in the road way. That's where I believed my partners were.

Q2:     So you thought they were in the roadway?

A:      Yes.

Q2:     Okay. And when the car… when the suspect car started moving and you said it didn't come towards you, you realized it didn't come to you, right? It actually…

A:      (Unintelligible) the impact, yeah.

Q2:     It turned more into the roadway.

A:      Yes.

Q2:         Okay.

A:          But it was initially facing directly at me.

Q2:         Absolutely. Did you see it turn into the roadway?

A:          No, I just heard the impact and I looked and that's when I saw the direction it went.

Q2:         The impact, being… just again, for people who aren't law enforcement and impact meaning… is that crashing, colliding with other cars?

A:          Yes.

Q2:         Okay. Do you know what cars it was colliding with, at that moment?

A:          That instant, it was a CHP car, my assumption…

Q2:         The K9 car.

A:          The K9 car but it was continuing so I don't know if it hit cars that were parked on the right side, yet. But I just know when I looked back, it hit and it was still going.

Q2:         Was it one collision, multiple collisions?

A:          It was multiple.

Q2:         Okay.

A:          And he was moving pretty fast, too, at that point.

Q2:         He was moving pretty fast.

A:          Yeah.

Q2:         Okay. And then you said… at one point, you said… and correct me if I'm wrong, did you think that any of your… I'm not sure if you said this or not but I'm just gonna ask you. Did you think that any of your partner's life were in danger or did… if any of them that got hit by this vehicle?

A:          I thought that their lives were in danger and if they… well, let me backtrack. If… I thought one of my partners was underneath the car.

Q2:         Okay. So let me stop you there. You thought one of your partners were underneath the car. Anyone in particular, did you think?

A:          No, because I didn't see anybody from the K9 vehicle or from the vehicle I was in.

Q2:         Okay. What was it that put that thought process in your head that you believe one of your partners was underneath the car? You already said that there was… you didn't see anybody in the seats of your car, so they had to be outside?

A:          Correct.

Q2:         So you can take it from there.

A:          So I didn't see anybody. Like I said, when I initially got out, I saw two people behind the car in front of me. Nobody was there with me, which led me to believe that they were on the other side of the car. Standard CHP protocol, when we're doing felony stops in this case, is take cover behind the door of the vehicle. We never would have run to the sidewalk, so when the car took off and I didn't see them, obviously they weren't with me, I highly doubt they would run… I didn't believe that they would run past the vehicle behind it. So my beliefs were they were still in the roadway, attempting to give the car… the driver of the car commands to stop.

| | | |
|---|---|---|
| 1 | Q2: | Okay. And when it's colliding or crashing with other cars, is it somewhere in that moment that you thought that one of those officers could have been ran over, hit by a car? |
| 2 | A: | I believed that they were either under the car or about to get hit. One of those two things. |
| 3 | Q2: | Okay. The sketch we should you is obviously… I apologize, this is my sketch, it's not to scale, but is |
| 4 | | that somewhat of an accurate positioning of the cars? And if there's anything that's a discrepancy, just point it out now. |
| 5 | A: | Are you talking post-scene or at the time of the incident? |
| 6 | Q2: | No, post-scene. I didn't know how to make it for prior. |
| 7 | A: | Post… I mean, somewhat, yeah. It looks somewhat… |
| 8 | Q2: | When we arrived, that's what (unintelligible). |
| 9 | A: | Yeah, when you guys arrived, yes. |
| 10 | Q2: | Okay. And you drew a circle right here on this sketch, what is this circle again right here? |
| 11 | A: | I was just saying that's maybe the general vicinity, at the time of the shooting, that I was at after it collided. |
| 12 | Q2: | Okay. And you said Sergeant Henderson… did you see where Sergeant Henderson was at during the |
| 13 | | time of the shooting? |
| 14 | A: | Yes. |
| 15 | Q2: | Where was he? |
| 16 | A: | He… |
| 17 | Q2: | You can mark and put… what's Sergeant Henderson's first initial? |
| 18 | A: | R. |
| 19 | Q2: | You can put RH where you saw him at the time of the shooting. |
| 20 | A: | So if the vehicles were still connected as it was ramming, he would have been in this area right here. Or, I'll do it (unintelligible)… |
| 21 | Q2: | Can you put RH so I just know where he's at? Okay. Did you see him shoot? |
| 22 | A: | I heard. |
| 23 | Q2: | You heard him shoot? |
| 24 | A: | I heard him shoot. |
| 25 | Q2: | But you saw him there but you heard him shoot? |
| 26 | A: | Yes. |
| 27 | Q2: | Can you explain that… can you explain… when you saw him, did he have his gun drawn? |
| 28 | A: | Yes. |
| 29 | Q2: | Okay. And it was pointed in one direction? |
| 30 | A: | It was facing eastbound. |
| 31 | Q2: | Okay. And the suspect vehicle was behind him or in front of him? |

Exhibit I

```
 1
 2
 3
 4
 5
 6
 7                              Saputa 1
 8                            Q=Yun Zhou
 9                           Q1=Leo Sanchez
10                          Q2=Brian Gabriel
11                          Q3=Autrey James
12                          Q4=James Morris
13                       Q5=Sergeant Barrientos
14                       Q6=Officer Joseph Neary
15                     Q7= Lieutenant George Rory
16                          Q8=Paul Willett
17                          A=Don Saputa
18
19    Q:
20
21    Q1:          All right.
22
23    Q:           Yeah.
24
25    Q1:          That's good, good, good.
26
27    Q:           It's…
28
29    Q2:          Um, it's time to get back to the seats and then we'll – all right. It is 8th of June
30                 2020. Right now, it's 1832 hours. Uh, I'm at 3601 Telegraph, CHP Office.
31                 Um, my name is Sergeant Yun Zhou. My badge number is 8951. And I'm
32                 Oakland Police Department on a homicide team in the uh Officer Involved
33                 Shooting Team. To my right is…
34
35    Q1:          Sergeant Sanchez, 8181 Charles, uh OIS, Officer Involved, Officer Involved
36                 Shooting Investigator.
37
38    Q2:          And Brian Gabriel, legal counsel for CAHP, representative for Officer Saputa.
39
40    A:           Then, Don Saputa, CHP Officer.
41
42    Q3:          What's your serial number?
43
44    A:           19984.
45
```

| | | |
|---|---|---|
| 46 | Q3: | I'm Autrey James, Alameda County uh Deputy District Attorney. |
| 47 | | |
| 48 | Q4: | James Morris, Alameda County DA's Office Inspector. |
| 49 | | |
| 50 | Q5: | Sergeant Fernando Barrientos, ID number 18962 with the California Highway |
| 51 | | Patrol. |
| 52 | | |
| 53 | Q6: | Officer Joseph Neary, uh, California Highway Patrol, um, 20456. |
| 54 | | |
| 55 | Q7: | Lieutenant George Rory, ID 13309, CHP. |
| 56 | | |
| 57 | Q8: | Paul Willett, District 2 Director for the California Association of Highway |
| 58 | | Patrolmen. |
| 59 | | |
| 60 | Q: | Okay, Officer Saputa, um, before this interview, I'm going to give you a um, |
| 61 | | advisement. Um, I want to make sure you understand that. Okay? So, I want |
| 62 | | you to un- understand that you're not required to answer any questions. And |
| 63 | | are you willing to provide a voluntary statement? |
| 64 | | |
| 65 | A: | Yes. |
| 66 | | |
| 67 | Q: | And spell your last name sir, it's S-A-P-U-T-A? |
| 68 | | |
| 69 | A: | Correct. |
| 70 | | |
| 71 | Q: | And your first name is Donald? |
| 72 | | |
| 73 | A: | Correct. |
| 74 | | |
| 75 | Q: | And your badge number is 19 – 19984? |
| 76 | | |
| 77 | A: | Yes. |
| 78 | | |
| 79 | Q: | Okay. Sir, how many years of law enforcement experience do you have? |
| 80 | | |
| 81 | A: | 11. |
| 82 | | |
| 83 | Q: | 11 years. Is that all with CHP? |
| 84 | | |
| 85 | A: | Yeah. |
| 86 | | |
| 87 | Q: | What is your current assignment? |
| 88 | | |
| 89 | A: | Uh, currently I'm assigned as an Investigator to the Southern Alameda County |
| 90 | | Major Crimes Task Force. |

| 856 | Q: | Mm-hm. |
|---|---|---|
| 857 | | |
| 858 | A: | And I give several announcements, uh, "Police, hands up." |
| 859 | | |
| 860 | Q: | Mm-hm. |
| 861 | | |
| 862 | A: | And at this point the driver of the Challenger is accelerating uh very heavy but |
| 863 | | the car isn't moving anywhere cause he's kind of jammed between the 2 |
| 864 | | vehicles. |
| 865 | | |
| 866 | Q: | Mm-hm. |
| 867 | | |
| 868 | A: | Eventually he's able to get the vehicle uh out between the truck and the patrol |
| 869 | | car. |
| 870 | | |
| 871 | Q: | Mm-hm. |
| 872 | | |
| 873 | A: | And he hits the patrol car and starts to drive um around it. |
| 874 | | |
| 875 | Q: | Okay. |
| 876 | | |
| 877 | A: | I'm still giving uh announcement as loud as I can, "Police, stop the vehicle." |
| 878 | | And the passenger window is down from what I recall, so I'm yelling, trying |
| 879 | | to get the attention of the driver. Um, but he doesn't respond whatsoever other |
| 880 | | than uh trying to maneuver the vehicle around the patrol car. |
| 881 | | |
| 882 | Q: | Okay. |
| 883 | | |
| 884 | A: | So, at this point the silver Dodge pickup had pulled behind the Crown Victoria |
| 885 | | patrol car. |
| 886 | | |
| 887 | Q: | Okay. |
| 888 | | |
| 889 | A: | And those investigators were getting out of that truck to try to come and |
| 890 | | assist. |
| 891 | | |
| 892 | Q: | Okay. |
| 893 | | |
| 894 | A: | One of the investigators that I saw specifically was Michael Diehl. |
| 895 | | |
| 896 | Q: | Uh-huh. |
| 897 | | |
| 898 | A: | And he was standing in the middle of the road, right next to the driver's door |
| 899 | | of the silver pickup. |
| 900 | | |

| 1531 | | like the truck was a little further South. |
|------|------|------|
| 1532 | | |
| 1533 | Q: | Okay. |
| 1534 | | |
| 1535 | A: | I think yeah, it's accurate. |
| 1536 | | |
| 1537 | Q: | Okay. You can um, modify that. |
| 1538 | | |
| 1539 | A: | Okay. |
| 1540 | | |
| 1541 | Q: | If you like. |
| 1542 | | |
| 1543 | A: | Something like that. |
| 1544 | | |
| 1545 | Q: | Okay. |
| 1546 | | |
| 1547 | A: | Is probably a little more accurate. |
| 1548 | | |
| 1549 | Q: | And then the position of the silver Ram which we put silver Ram, is that, is |
| 1550 | | that accurate? Or should, should that be (unintelligible)? |
| 1551 | | |
| 1552 | A: | I don't think so. |
| 1553 | | |
| 1554 | Q: | Okay. |
| 1555 | | |
| 1556 | A: | Uh, yeah, at the time of this incident, the silver Ram I believe was actually a |
| 1557 | | little further over, like this. |
| 1558 | | |
| 1559 | Q: | Okay. And then could you put a triangle on which way the car is facing? |
| 1560 | | |
| 1561 | A: | Yeah. |
| 1562 | | |
| 1563 | Q: | And then where was Diehl? |
| 1564 | | |
| 1565 | A: | So, when I saw Diehl, he was standing right here. |
| 1566 | | |
| 1567 | Q: | Okay. |
| 1568 | | |
| 1569 | A: | Right next, right next to the driver's door of the silver Ram. |
| 1570 | | |
| 1571 | Q: | Mm-hm. |
| 1572 | | |
| 1573 | A: | And this is the space that I was referring to, which I thought was maybe 5ft. |
| 1574 | | |
| 1575 | Q: | Got it. And, and for the um, those listening on the phone. Uh, the silver Ram |

| 1576 | | uh was redrawn to be I guess another three quarter of car length further South. |
|---|---|---|
| 1577 | | And we are place an X by what it would be the driver side door of that silver |
| 1578 | | Ram. Uh denoting that to be uh Officer Diehl. Now, uh, in this snap frame, in |
| 1579 | | this timeframe, where was the Dodge Hellcat? |
| 1580 | | |
| 1581 | A: | So, now the Hellcat had gotten out of this position. |
| 1582 | | |
| 1583 | Q: | Mm-hm. |
| 1584 | | |
| 1585 | A: | It was more angled like this. |
| 1586 | | |
| 1587 | Q: | Okay. And, where were you? |
| 1588 | | |
| 1589 | A: | At this point I started moving further over. So, I was probably, maybe in this |
| 1590 | | position right here. |
| 1591 | | |
| 1592 | Q: | Okay. And you, could you fix that S sorry. |
| 1593 | | |
| 1594 | A: | I'm sorry. |
| 1595 | | |
| 1596 | Q: | It's okay. Now at this timeframe, uh this snap kind of shot in time, do you, are |
| 1597 | | you aware of the positioning of your fellow officers? |
| 1598 | | |
| 1599 | A: | Yeah. So, I believe uh, at this time Sergeant Henderson was somewhere |
| 1600 | | around here still. |
| 1601 | | |
| 1602 | Q: | Okay. And anybody else? |
| 1603 | | |
| 1604 | A: | Not, but other than Diehl, no. |
| 1605 | | |
| 1606 | Q: | Okay. |
| 1607 | | |
| 1608 | A: | Yeah. |
| 1609 | | |
| 1610 | Q: | And now you said this vehicle begin uh accelerating? |
| 1611 | | |
| 1612 | A: | Yeah. |
| 1613 | | |
| 1614 | Q: | Um, and, and you said it's accelerating and toward the Diehl and you |
| 1615 | | discharge your rifle? |
| 1616 | | |
| 1617 | A: | Correct. |
| 1618 | | |
| 1619 | Q: | How long from this snapshot to when you first beginning um to uh discharge |
| 1620 | | your rifle? |

Exhibit J



Exhibit K





