ROB BONTA
Attorney General of California
JEFFREY R. VINCENT
Supervising Deputy Attorney General
State Bar No. 161013
ROHIT S. KODICAL
Deputy Attorney General
State Bar No. 215497
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-1007
  Fax:  (510) 622-2270
  E-mail:  Jeffrey.Vincent@doj.ca.gov
*Attorneys for Defendants Sgt. Richard Henderson,
Officer Eric Hulbert, and Officer Donald Saputa*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.S. individually and as Successor[in Interest to Decedent ERIK SALGADO by and through her guardian ad litem Michael Colombo; BRIANNA COLOMBO and FELINA RAMIREZ, Mother of decedent ERIK SALGADO,<br><br>                  Plaintiff,<br><br>v.<br><br>RICHARD HENDERSON, et al.,<br><br>                  Defendants. | Case No.  3:20-cv-04637-VC<br><br>**DECLARATION OF COUNSEL IN SUPPORT OF REPLY TO OPPOSITION TO MOTION FOR RELIEF FROM NON-DISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE**<br><br>Date:          October 7, 2021<br>Time:         2:00 p.m.<br>Courtroom:  4, 17th Floor<br>Judge:        Hon. Vince Chhabria<br>Trial Date:   March 28, 2022<br>Action Filed: July 13, 2020 |

I, JEFF R. VINCENT, declare as follows:

     1.    I am an attorney licensed to practice law before all courts in the State of California.  I am a Supervising Deputy Attorney General with the Office of the Attorney General for the State of California, attorneys of record for Defendants Sgt. Richard Henderson, Officer Eric Hulbert, and Officer Donald Saputa  (Defendants).  The following facts are based on my personal knowledge and review of and familiarity with this file, except as to those matters stated on information and belief.  If called as a witness I could and would testify competently thereto.

1

2. Attached as **Exhibit 1** are true and accurate copies of relevant portions of the deposition of California Highway Patrol Sergeant Gregory Ramos taken in this action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and I have executed this document at Oakland, California.

Dated: October 6, 2021

/s/ *Jeff R. Vincent*

Jeff R. Vincent
Supervising Deputy Attorney General

OK2020900260
91427169.docx

2

Decl. of Counsel in Supp. Reply to Opp. to Motion for Relief from Order of Magistrate Judge (3:20-cv-04637-VC)

# EXHIBIT 1

**DEPOSITION OF SERGEANT GREGORY RAMOS - VIDEOCONFERENCE**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

--o0o--

L.S., individually and as successor-in-interest to Decedent ERIK SALGADO by and through her guardian ad litem Michael Colombo; BRIANNA COLOMBO and FELINA RAMIREZ Parent of decedent,

    Plaintiffs,

    vs.    CASE NO.: 3:20-cv-04637 VC

RICHARD HENDERSON, ERIC HULBERT, DONALD SAPUTA and DOES 4-25, inclusive,

    Defendants.

CERTIFIED COPY

(Pages 106 - 111 are SEALED and BOUND SEPARATELY.)

VIDEOCONFERENCE

DEPOSITION OF SERGEANT GREGORY RAMOS

FRIDAY, AUGUST 27, 2021

2:45 p.m. - 6:20 p.m.

ALAMEDA COUNTY, CALIFORNIA

REPORTED BY: LILIANA RODRIGUEZ, CSR No. 13783

1

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
**1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)**

**DEPOSITION OF SERGEANT GREGORY RAMOS - VIDEOCONFERENCE**

```
 1   REMOTE APPEARANCES:
 2
 3         For Plaintiffs:
 4              THE LAW OFFICE OF JOHN L. BURRIS
                BENJAMIN NISENBAUM, ATTORNEY AT LAW
 5              JAMES COOK, ATTORNEY AT LAW
                7677 Oakport Street, Suite 1120
 6              Oakland, California 94621
                510.839.5200
 7              Bnisenbaum@gmail.com
                James.cook@johnburrislaw.com
 8
           For Plaintiffs:
 9
                LAW OFFICES OF JAMES B. CHANIN
10              JAMES B. CHANIN, ATTORNEY AT LAW
                3050 Shattuck Avenue
11              Berkeley, California 94705
                510.848.4752
12              Jbcofc@gmail.com
13         For Defendants:
14              OFFICE OF THE ATTORNEY GENERAL
                DANIEL B. ALWEISS, DEPUTY ATTORNEY GENERAL
15              1515 Clay Street, 21st Floor
                Oakland, California 94612
16              510.879.0282
                Daniel.Alweiss@doj.ca.gov
17
18
19
20
21
22
23
24
25
```

2

INDEX TO EXAMINATION

WITNESS: SERGEANT GREGORY RAMOS

| EXAMINATION | PAGE |
|---|---|
| By Mr. Nisenbaum | 4 |

CONFIDENTIAL TESTIMONY
(Bound separately)
Pages 106 - 111

INDEX TO EXHIBITS

SERGEANT GREGORY RAMOS

L.S. vs. Richard Henderson, et al.

FRIDAY, AUGUST 27, 2021

Liliana Rodriguez, CSR No. 13783

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Carrillo Body Cam Video<br>Carrillo, Carlos_2020-06-06_22-52-14.AVI | 56 |
| Exhibit B | Henderson Diagram | 62 |
| Exhibit C | Ramos Diagram | 98 |
| Exhibit D | Salgado OIS IAR.pdf | 103 |
| Exhibit E | Ausmus Body Cam Video<br>Ausmus, Lisa_2020-06-06_22-56.45.AVI | 116 |

RECORD MARKED

PAGE   LINE
130    18

3

1  A. For sure one.

2  Q. Okay. You saw at least one. And the one that
3  you saw you described as a crash as opposed to a tap; is
4  that correct?

5  A. Just to clarify, when we say -- highway patrol
6  used to say collision, now it's crash. It's a word to
7  describe a damage-causing event. Now, this -- how
8  significant whether it was a minor crash or a major
9  crash is subjective, right? And from my point of view I
10 couldn't assess damage because I couldn't see the rear
11 bumper of the Challenger Hellcat versus the front of the
12 Ram.

13 Q. Did you hear it? Did you hear the contact?

14 A. Yes.

15 Q. What did it sound like? A major crash, a minor
16 crash, something in between?

17 A. It sounded like something in between. I wouldn't
18 call it major crash.

19 Q. Okay. And any indication at this point there are
20 any weapons inside the Dodge Challenger?

21 A. Just that he was using the Challenger as a weapon
22 itself.

23 Q. As a weapon? It sounds like he was using it
24 potentially as a tool to try to --

25      MR. ALWEISS: Objection. Argumentative. The

43

1   was still?  Was it in forward motion or was it totally
2   stopped when the contact occurred?
3       A.  From what I could tell it looked stopped.
4       Q.  Okay.
5           All right.  And once that first contact happened,
6   what happened next?
7       A.  Well, I got out of the truck as well as Eric and
8   Mike Diehl.  We exit the truck and that's when I saw the
9   Challenger come forward and accelerate aggressively and
10  hit the front of the K-9 car.
11      Q.  Okay.  What part of it hit the front of the K-9
12  car?
13      A.  The front of it.
14      Q.  Was it head-on, squarely head-on or was it off to
15  one side or the other?
16      A.  I would say it was more head-on.
17      Q.  Okay.  And you exited from the --
18      A.  Right front door.
19      Q.  The right front door, correct.  I was going to
20  say the front passenger side door, correct?
21      A.  Yes.
22      Q.  Okay.  And once you exited, where did you go?
23      A.  So I initially wanted to move forward and get
24  behind the Challenger.  As I exit the vehicle I wanted
25  to get -- be able to get behind the Challenger back to

46

1  Q.  When you -- during the time that you walked
2  forward you were on the passenger side of the silver
3  Dodge truck; is that correct?
4  A.  Yes.
5  Q.  Okay.  And did you walk to the front of the Dodge
6  truck?
7  A.  Yeah, I didn't break the plane of the front
8  bumper I would say.
9  Q.  Okay.  And then what did you do next?
10 A.  So I was continuing to try to find a pathway to
11 get up to Henderson's truck.  So I turned back and I was
12 thinking if I drop back on the passenger side of the
13 truck in the direction towards 98th Street that -- or I
14 guess to the east, that there might be behind one of
15 these parked cars an opening to make my way to the
16 sidewalk on the north side and then get up there.  But
17 the cars, again, were just so -- parked, you know,
18 bumper to bumper that it was -- I was beginning to panic
19 as far as that.  And that's about when as I was making
20 my way towards the east, that's when I heard "Watch out
21 for the cross fire.  Watch out for the cross fire."
22 Q.  Making your way east means towards the back of
23 your truck?
24 A.  Yes, sir.
25 Q.  On the passenger side?

DEPOSITION OF SERGEANT GREGORY RAMOS - VIDEOCONFERENCE

```
1       A.   On the passenger side.
2       Q.   And you heard "Watch out for cross fire"; is that
3   right?
4       A.   That's right.
5       Q.   Who did you hear say that?
6       A.   I don't remember.  I just remember hearing it
7   from near Henderson's truck on that side of the
8   commotion.
9       Q.   Okay.  So you were able to hear that, correct?
10      A.   Yes.
11      Q.   Was it being yelled?
12      A.   Yes.
13      Q.   What was the Dodge Challenger doing at that time?
14      A.   So as I recollect it, it was -- I continued to
15  hear the engine revving and the tires squealing.  I was
16  starting to begin to see tire smoke and I could -- I was
17  hearing like sounds of crashing.  So as I -- without
18  seeing it I was imagining that the driver of the Hellcat
19  was doing a rocking back and forth motion, you know,
20  driving forward, driving backwards, driving forward,
21  driving backwards.  That's how I remember imagining what
22  was happening as I -- as my back was towards that going
23  on.
24      Q.   Okay.  But you're still on the passenger side of
25  the silver Dodge Ram; is that right?
```

49

**DEPOSITION OF SERGEANT GREGORY RAMOS - VIDEOCONFERENCE**

1    A.  So at that point, in about -- in that location at
2  the right rear bumper of the silver Ram, I remember
3  looking across the street and seeing an opening or a gap
4  between parked vehicles just adjacent to the driver side
5  of our truck.  I remember thinking or sensing -- seeing,
6  I think, Eric Hulbert on that south sidewalk.
7    Q.  Is this across the street from you?
8    A.  Yes.
9    Q.  So this would mean crossing Cherry Street to get
10 to the other side of 96th?
11        MR. ALWEISS:  No.  He's talking about the silver
12 pickup, the driver side.  The sidewalk adjacent to the
13 driver side.
14 BY MR. NISENBAUM:
15    Q.  So your intention was to cross Cherry --
16    A.  Yes.
17    Q.  -- to get to the other side of Cherry Street; is
18 that right?
19    A.  That's right.
20        MR. ALWEISS:  Do you want him to continue?
21        MR. NISENBAUM:  Yeah.
22        THE WITNESS:  Okay.  So as I see this gap and
23 keeping in mind of the cross fire, the warning, I made
24 up my mind that I was going to run across the gap to the
25 south sidewalk and then attempt to make my way up to the

50

area of Sergeant Henderson's truck from that sidewalk, because on the north side the cars were tightly parked. It just seemed like I was running out of options to try and escape out of this and get to what I perceived as safety.

BY MR. NISENBAUM:

    Q.  Wouldn't that put you in line with the cross fire?  That would have you running through the potential cross fire, right?

    A.  Everywhere -- in my head everywhere on the east side of that Challenger is in the cross fire, so as long as I was on the east side of that Challenger I was in the cross fire.  I didn't feel safe until I would have been on the left side of it.

    Q.  If you were on the sidewalk you would have been safe, right?

    A.  Not necessarily.

    Q.  Okay.  Let's pause there for one second.

    MR. ALWEISS:  Do you want to take a break?  We've been going over an hour.

    MR. NISENBAUM:  I'm just going to cue up some exhibits but we can take a break to do that.

    MR. ALWEISS:  Five-minute break.  Thank you.

    (Off the record.)

    MR. NISENBAUM:  I'm going to share the screen and

51

**BARBARA J. BUTLER & ASSOCIATES - Certified Court Reporters**
1659 Scott Blvd., Suite 15, Santa Clara, CA 95050 - (510) 83-BUTLER (28853) or (408) 248-BUTLER (2885)

1   A.   Yes, sir.
2   Q.   I couldn't hear you.
3   A.   Yes.
4   Q.   Okay.  Thank you.
5        Now, did you ever cross in front of the Dodge --
6   in front of the Challenger?
7   A.   I found myself in a very unfortunate position and
8   it's not as simple as "yes" or "no."  I can explain if
9   allowed.
10  Q.   Go ahead.
11  A.   So as I was at the rear of Eric's truck, the Ram,
12  and I was looking to cross the street and I was
13  beginning to feel the exigency of the circumstance
14  between the ramming of the vehicle and then when I prior
15  heard "Watch the cross fire," I knew I needed to get to
16  safety.  To me in my head safety meant I needed to be on
17  the other side of the Challenger near Henderson's truck.
18  I saw that I couldn't go forward in fear of getting my
19  legs pinched from kinetic energy of the Challenger of
20  the K-9 into parked cars and then retreated back
21  eastbound along the passenger side of Eric's Ram truck
22  noting that the cars parked on the north curb line were
23  parked bumper to bumper and I had no gap or access to
24  get to the north sidewalk.  I then turned my attention
25  to the south sidewalk and I saw an opening between

57

1  parked cars on the south curb line.
2           At that time the Challenger from what -- all the
3  senses I could muster in that moment was still up there
4  between the K-9 vehicle and Henderson's Ram truck.  And
5  I made the ultimate decision to run across the street,
6  and that decision was made feeling that it was
7  relative -- in my head it was relatively safe to do so
8  because I felt that the Challenger was pinched between
9  the Ram truck and the K-9 vehicle.  That coupled with
10 street being so narrow with the parked cars and then our
11 cars, the K-9 and Eric's Ram truck, that I felt there
12 was some relative safety to cross that gap to the south
13 sidewalk.
14          It's at that point that -- and to my absolute
15 shock and surprise, when I heard what appeared to be a
16 wide open throttle application of the Challenger and I
17 look and it's barrelling at me sideways with the right
18 side wheels up in the air and it's launching through the
19 gap coming straight at me, and I was maybe one and a
20 half or two steps out from behind the rear of Eric's
21 truck when this is happening.  It was sudden and
22 unexpected and to be frank, shocking.  I felt that it
23 defied physics in the manner in which this Challenger
24 was in the air sideways -- tilted sideways, engine
25 roaring.  It was -- I was shocked and I feared for my

58

1  life.  I knew at that point that I needed to turn around
2  and get back behind Eric's truck, because if I didn't I
3  was going to be squished and ran over.  And that's what
4  I did.  I stopped about two steps out into the gap, I
5  pivoted, I crouched.  I got in an athletic stance and
6  darted as fast as I could back to behind Eric's Ram
7  truck.  And in doing so, I crouched down bent over at
8  the waist because I still had the wherewithal to
9  remember the prior warning of "Watch the cross fire."  I
10 knew -- I had that feeling that the action taken by the
11 driver of the Challenger was aggressive enough that
12 it -- bad things could happen.
13     Q.  So that's pretty much your entire narrative of
14 what happened in that sequence of events, correct?
15     A.  Yes, sir.
16     Q.  Okay.  So I'm going to show you a video -- or not
17 a video but the diagram.
18     A.  Okay.
19     Q.  You walked behind the silver Ram, correct?
20     A.  Yes.
21     Q.  And you actually -- did you break the plane of
22 the driver's side of the silver Ram into the street?
23     A.  Yes, I did.
24     Q.  And you said you took about two steps beyond that
25 plane; is that correct?

59

**DEPOSITION OF SERGEANT GREGORY RAMOS - VIDEOCONFERENCE**

1  A.  That's correct.
2  Q.  Okay.  And at that point in time did you walk up
3  to the driver's side door of the silver Ram?
4  A.  No.  No.  I turned and darted -- ran as fast as I
5  could back behind the tailgate of the Ram behind the
6  rear bumper.
7  Q.  Okay.  So how long were you outside -- were you
8  out past the plane of the driver side of the silver Ram?
9       MR. ALWEISS:  Objection.  Asked and answered.  He
10 stated two steps.
11      MR. NISENBAUM:  I asked how long.  I didn't say
12 how many steps.  I asked how long.
13      MR. ALWEISS:  You're referring to time?
14      MR. NISENBAUM:  Yes.
15      THE WITNESS:  I mean, I didn't have a stopwatch.
16 I wasn't watching the seconds hand on my watch.  I liken
17 it to a baseball player leading off of first base and
18 then -- not that part but the part where a pitcher would
19 turn and try and pick a base runner off of first base.
20 The reaction a runner would take to get back to first
21 base without being thrown out.  So I attempted to run
22 across the gap.  To my surprise I saw the Challenger
23 barrelling down at me.  I turned and quickly darted back
24 behind the Ram truck, so you're talking seconds three,
25 four seconds.  And that's a --

60

```
1      STATE OF CALIFORNIA  )
                            )
2      COUNTY OF FRESNO     )

3

4           I, LILIANA RODRIGUEZ, Certified Shorthand Reporter,

5      in and for the State of California, do hereby certify:

6           That the foregoing proceedings were taken before me

7      remotely at the time and place herein set forth; that

8      any witnesses in the foregoing proceedings, prior to

9      testifying, were duly sworn; that a record of the

10     proceedings was made by me using machine shorthand which

11     was thereafter transcribed under my direction; that the

12     foregoing is a true record of the testimony given.

13          Pursuant to Federal Rule 30(e), transcript review

14     was requested.

15          I further certify that I am neither financially

16     interested in the action, nor a relative or employee of

17     any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date subscribed my

19     name.

20

21     DATED:   __9__/__1__/_21__

22     Fresno, California

23

24             _/s/Liliana Rodriguez_____
               LILIANA RODRIGUEZ, CSR No. 13783
25
```

133